**Robert HINKLE [SSN: 486–80–9537], Plaintiff,**

v.

**John J. CALLAHAN, Ph.D., Acting Commissioner of Social Security, Defendant.**

**No. 96–3066–CV–S–BC.**

United States District Court, W.D. Missouri, Southern Division.

March 31, 1997.

Cynthia MacPherson, Mountain Grove, MO, for Plaintiff.

Jerry Short, U.S. Attorney's Office, Kansas City, MO, for Defendant.

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LARSEN, United States Magistrate Judge.

Plaintiff Robert Hinkle seeks review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq. and for supplemental security income ("SSI") benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the Administrative Law Judge failed to give appropriate weight to the assessment's of plaintiff's treating physician, Dr. Ball, and that the hypothetical questions posed to the vocational expert did not encompass all of plaintiff's impairments. I find that (1) the ALJ properly discounted the opinion of Dr. Ball, and (2) the ALJ properly excluded from the hypothetical question posed to the vocational expert the condition that plaintiff must lie down and rest for up to three hours a day. Therefore, plaintiff's motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

### I. BACKGROUND

On August 19, 1993, plaintiff applied for disability insurance benefits, alleging that he had been disabled since May 30, 1991. Plaintiff's disability stems from a history of coronary artery disease. Plaintiff's application was denied initially and upon reconsideration. On October 21, 1994, a hearing was held before an Administrative Law Judge ("ALJ"). On December 28, 1994, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On December 18, 1995, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

### II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under § 205. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Johnson v. Chater,* 108 F.3d 178, 179 (8th Cir.1997); *Andler v. Chater,* 100 F.3d 1389, 1392 (8th Cir.1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission,* 450 U.S. 91, 99, 101 S.Ct. 999, 1006–07, 67 L.Ed.2d 69 (1981)). *See also Thompson v. Sullivan,* 928 F.2d at 277.

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. at 1427; *Jernigan v. Sullivan,* 948 F.2d 1070, 1073 n. 5 (8th Cir.1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposition decision." *Id.; Clarke v. Bowen,* 843 F.2d 271, 272–73 (8th Cir.1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. *Griffon v. Bowen,* 856 F.2d 1150, 1153–54 (8th Cir. 1988); *McMillian v. Schweiker,* 697 F.2d 215, 220–21 (8th Cir.1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The regulations, referred to generally as Medical–Vocations Guidelines, are codified in 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520:

(b) If you are working. If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience.

(c) You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not have a severe impairment.

(d) When your impairment(s) meets or equals a listed impairment in Appendix 1. If you have an impairment(s) which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.

(e) Your impairment(s) must prevent you from doing past relevant work. If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.

(f) Your impairment(s) must prevent you from doing any other work. (1) If you cannot do any work you have done in the past because you have a severe impairment(s), we will consider your residual functional capacity and your age, education, and past work experience to see if you can do other work. If you cannot, we will find you disabled.

This sequential analysis can be summarized as follows:

1. Is the claimant working?

Yes = not disabled.

No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

No = not disabled.

Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.

No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.

Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes = disabled.

No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff, plaintiff's wife, and vocational expert Mark Schulzinger; an affidavit of Joan Latimer; plaintiff's medical records, including the records of his treating physician Dr. Michael Ball; hospital records; earnings records; a medications list; a work background form; vocational forms; a Residual Functional Capacity Assessment form; and a Residual Functional Assessment form.

The evidence shows that plaintiff has experienced the following medical and employment history: On November 9, 1990, plaintiff left his job as a laborer at Tyson Foods (Tr. at 124). The following day he celebrated his 28th birthday. Plaintiff began having chest pain while at a bar drinking beer in celebration of his birthday (Tr. at 174). On November 14, 1990, plaintiff was rushed to the Emergency Room due to chest pains. He was given Nitroglycerin tablets for pain relief and was diagnosed with unstable angina (Tr. at 171). The medical reports indicate that plaintiff was smoking approximately one pack of cigarettes per day at the time and requested permission to smoke while he was in the Intensive Care Unit (Tr. at 172). Dr. Myears, a cardiologist with St. John's Hospital, was consulted, and he recommended that plaintiff be transported by ambulance to St. John's (Tr. at 172). Although it was strongly recommended that he not go by private car, plaintiff stated that he needed to go get some money and "take care of some business" and he signed out (Tr. at 172). He was given medical records in the event he decided to go to St. John's on his own (Tr. at 172).

On November 15, 1990, plaintiff went to St. John's Hospital where he was diagnosed with unstable angina and tests revealed a 99% distal right coronary lesion. Dr. Myears treated plaintiff and was successful in reducing the coronary artery narrowing to 20%. Plaintiff was discharged on November 17, 1990 (Tr. at 186–201).

On the morning of November 19, 1990, plaintiff was taken to St. John's due to severe chest pains and underwent emergency coro-nary angiography (Tr. at 184). Plaintiff was discharged on November 27, 1990 (Tr. at 183).

From approximately May 1991 to approximately July 1991, plaintiff worked as a laborer at Simpson Cabinet (Tr. at 124). Prior to this employment, plaintiff had not worked since he left his job at Tyson Foods in November 1990 (Tr. at 124).

On August 22, 1991, plaintiff went to see his family physician, Dr. Michael Ball, complaining of tightness in the chest (Tr. at 238). Dr. Ball's notes state that the "exam reveals this [patient] in no apparent distress", and that his "EKG [is] normal, no treatment at this time" (Tr. at 238). Plaintiff requested that Dr. Ball check plaintiff's cholesterol level (Tr. at 238). On September 6, 1991, plaintiff was placed on a low-cholesterol diet (Tr. at 238).

From approximately May 1993 to August 9, 1993, plaintiff worked at Nixon Dairy Farm milking cows (Tr. at 124). On August 9, 1993, plaintiff went to the emergency room after experiencing chest pains at work (Tr. at 213). The medical notes state that plaintiff's pain lasted approximately 20 minutes and had completely stopped by the time he was seen in the emergency room (Tr. at 213). The notes also state that plaintiff's EKG was unchanged from the previous EKG at St. John's in 1990 (Tr. at 215). During this emergency room visit, plaintiff reported that he was supposed to be taking Coumadin but had not been taking it for quite some time because he could not afford it (Tr. at 213, 215, 228). He also reported that he was smoking approximately two packs of cigarettes per day and that he had been smoking since he was 8 years old (Tr. at 215). Plaintiff left the hospital against the advice of his doctors "to take care of some personal business related to work and family." (Tr. at 216). Plaintiff was told that he was in serious condition but left anyway agreeing to wear a Holter monitor until he returned (Tr. at 216). Plaintiff did not return to work at the Nixon Dairy Farm after August 9, 1993 (Tr. at 124).

The following day, August 10, 1993, plaintiff returned to the emergency room after

experiencing chest pains (Tr. at 210). The medical notes state that the cause of his chest pain was undetermined, but that acute myocardial infarction was unlikely and his test results showed a low probability of pulmonary embolism (Tr. at 210). Dr. John Powell arranged for plaintiff to take a stress test the following week (Tr. at 211).

On August 18, 1993, plaintiff participated in a Thallium exercise treadmill test (Tr. at 204). Plaintiff did not complete the test due to leg fatigue (Tr. at 204). The medical notes state that plaintiff "has a history of having chest pain over the last 6 months occurring at rest usually lasting a short time, and is not necessarily related to exercise." (Tr. at 204).

On August 19, 1993, plaintiff filed an application for disability benefits.

On August 24, 1993, plaintiff had a follow-up visit with Dr. Powell (Tr. at 228). Dr. Powell's notes indicate that plaintiff's chest pain and heart burn are sometimes associated with exercise but may occur at rest (Tr. at 228). The notes also state that "[plaintiff] does smoke approximately 1 pack per day. This is a decrease from 2 packs a day which is what he smoked when I saw him in the ER August 9th." (Tr. at 228). Plaintiff's weight at the time of this visit was 162½ pounds (Tr. at 228). The following day, an upper GI series was performed which showed a small sliding-type hiatal hernia in the distal esophagus (Tr. at 230).

On November 15, 1993, plaintiff saw Dr. Ball due to chest pains (Tr. at 237). Dr. Ball's notes state that plaintiff had no chest pain at the time the EKG was performed and that the cause of the chest pain was uncertain (Tr. at 237).

On January 25, 1994, plaintiff was seen by Dr. Cochran at the request of Family Services (Tr. at 240). The medical notes state that plaintiff reported that he "was advised by his physician to give up his job [as a farm laborer] and has been unemployed since" (Tr. at 240).[1] The notes further state that plaintiff's chest pain "may occur at any time. It is not necessarily precipitated by exercise.

It may occur while at rest, he states on occasion it occurs during the night. ... He does state he does minor calisthenics at home and occasionally experiences fatigue ... He smokes one pack of cigarettes a day and has smoked for 23 years" (Tr. at 240–241). Plaintiff's weight at this visit was 184 pounds (Tr. at 241).

On July 28, 1994, plaintiff was again examined by Dr. Cochran. Dr. Cochran reported that plaintiff's medical condition was unchanged since the January visit, that plaintiff was "apparently active at home, carrying on moderate sedentary activities." (Tr. at 244). Plaintiff's weight at this visit was 193 pounds (Tr. at 244). Dr. Cochran commented that he "would not be able to certify [plaintiff] as disabled from ordinary gainful activity." (Tr. at 245).

On August 16, 1994, plaintiff saw Dr. Ball due to chest pains (Tr. at 256). An EKG revealed no evidence of ischemic changes (Tr. at 256). On August 30, 1994, plaintiff again saw Dr. Ball. The medical notes from that visit state "talk to Dr. about paper from McPherson" and for the first time indicate that plaintiff complained of numbness and tingling in his arms and legs (Tr. at 256). The following day, Dr. Ball completed a Residual Functional Capacity Assessment form (Tr. at 259–264).

On December 23, 1994, plaintiff went to the emergency room at St. John's Hospital complaining of chest pains (Tr. at 265). The medical notes state that plaintiff "has not been seen except intermittently and apparently he has been noncompliant to medical therapy. ... He continues to smoke one pack of cigarettes per day." (Tr. at 265). Plaintiff's EKGs on this occasion were normal (Tr. at 266). Plaintiff was referred to Dr. Myears who wrote "[plaintiff] was noted to be noncompliant with his Coumadin therapy and follow-up appointments and I have not seen him in at least three years." (Tr. at 267, 269). The medical notes state that plaintiff "states that he was in his usual state of fairly good health until the day prior to admission" (Tr. at 267). The notes further

---

**1.** It should be noted that nowhere in the medical records provided by plaintiff does any doctor recommend that plaintiff stop working.

state that plaintiff's symptoms were "[c]ompletely negative except for intermittent tingling in his legs and arms. He continues to smoke approximately a pack of cigarettes a day." (Tr. at 267). The notes reflect that plaintiff "was advised once again to discontinue smoking." (Tr. at 269). Plaintiff was discharged on December 28, 1994 (Tr. at 269–270).

At the hearing, plaintiff testified that he was advised by his physician not to return to work at Tyson Foods in November 1990 (Tr. at 42, 53). He stated that he quit his next job at Simpson Cabinet because he started having chest pains; however, things were getting slow so he would have been let go anyway (Tr. at 42). When plaintiff was working at Nixon Dairy Farm, he had problems with his arms and legs going to sleep if he sat or stood for too long (Tr. at 45, 51, 58). Plaintiff stated that he has mentioned this problem to his doctor but his doctor has never asked him "to come back in." (Tr. at 46). Plaintiff testified that he cannot stand or sit for more than 10 or 15 minutes, resulting in his having to pop up and down constantly (Tr. at 46). However, if he can get comfortable lying down, he does not have to change positions so frequently (Tr. at 46). Plaintiff stated that he has mentioned this problem to his doctor but the doctor has said nothing about it (Tr. at 46). Plaintiff testified that he suffers from shortness of breath, but has never been tested for that problem (Tr. at 48). Plaintiff also testified that he suffers from a loss of grip in his-hands and frequent lower back pain (Tr. at 51, 53). Plaintiffs loss of grip allegedly began a few months after his angioplasty and consists of sharp pains up and down his forearm (Tr. at 52). Plaintiff stated that the loss of grip only occurs when he is "active and doing something," but that amounts to two or three times per week (Tr. at 52). The lower back pain consists of a sharp pain when he stoops for very long or has to bend frequently (Tr. at 53). Plaintiff testified that he has told Dr. Ball about the back pain but has never been treated for it (Tr. at 53–54). He stated that Dr. Ball recommended exercises which plaintiff attempts to do but sometimes can't due to chest pains or severe back pain (Tr. at 54). Plaintiff suffers from lower back pain two or three times a week (Tr. at 54). For relief, plaintiff normally lies down (Tr. at 54).

Plaintiff testified that he suffers from headaches and blackouts (Tr. at 55–56). At the time of the hearing, plaintiff's most recent blackout was approximately two months prior and lasted 5 to 10 minutes (Tr. at 56–57). Plaintiff allegedly suffers from blackouts once or twice a month; however, the blackouts only occur at home, only his wife has witnessed these blackouts, and he has not seen a doctor about them (Tr. at 56–57, 62). Plaintiff stated that the blackouts have occurred since he was 16 years old; however, the frequency of once or twice a month did not begin until approximately 1989 (Tr. at 61). Plaintiff has not told any doctors about these blackouts because he has gotten used to them (Tr. at 62). These blackouts have not prevented plaintiff from working in the past (Tr. at 62). In addition, plaintiff has a problem with nervousness—it does not take much to get him nervous and then his hands begin shaking (Tr. at 58).

Plaintiff testified that he continues to suffer from infrequent chest pains on an irregular basis, even though he is taking his prescribed medication (Tr. at 49). These chest pains occur regardless of whether plaintiff is active or lying down (Tr. at 49). At the time of the hearing, plaintiff was smoking 1 to 1½ packs of cigarettes per day (Tr. at 58).

Plaintiff testified that he attempts to mow the yard, but that he has to sit or lie down and rest before he finishes the entire yard (Tr. at 59). In addition, plaintiff watches his six-year old son and gets him ready for kindergarten each morning (Tr. at 59).

Plaintiff's wife testified that nothing precipitates plaintiff's chest pains (Tr. at 64). She said plaintiff suffers from shortness of breath from merely walking across a room or just sitting (Tr. at 64). When plaintiff experiences shortness of breath, he either waits until it goes away or gets up and walks around a little bit (Tr. at 65). She stated that plaintiff tries to vacuum, but has to stop and sit down before he finishes (Tr. at 65). Plaintiff tries to do dishes, but sometimes he can only do this for about two or three minutes before having to sit down and rest

(Tr. at 65). She testified that plaintiff's arms and legs go to sleep if he sits for 10 or 15 minutes or if he's walking too much; that he loses his balance and he fell once because of numbness in his legs; that he experiences blackouts; that he starts having chest pains if he gets down on the floor to play with his son; and that he's depressed quite a bit (Tr. at 65–66).

The ALJ made the following findings in determining that plaintiff was not entitled to a period of disability, disability insurance benefits, or supplemental security income:

1. The claimant met the disability insured status requirements of the Act on May 30, 1991, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since May 30, 1991.

3. The medical evidence establishes that the claimant has severe impairments, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony was not credible. The testimony of the claimant's witness was not credible.

5. The claimant has the residual functional capacity to at least perform the work-related activities described by Dr. Ball in Exhibit 32; as such, he has the residual functional capacity to at least perform the duties of a wide range of sedentary work.

6. The claimant is unable to perform his past relevant work.

7. The claimant is 32 years old, which is defined as a younger individual (20 CFR 404.1563 and 416–963).

8. The claimant has limited formal education (20 CFR 404.1564 and 416.964).

9. In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

10. Vocational expert testimony established that in consideration of the claimant's residual functional capacity and vocational profile, he retains the ability to perform occupations which exist in significant numbers in the national economy. The testimony of the vocational expert is consistent with the conclusion reachable under the framework of Vocational Rule 201.24, Table 1, Appendix II, Subpart P, Regulations No. 4.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. at 19–20).

Because the ALJ found that (1) plaintiff has the residual functional capacity at least to perform the duties of a wide range of sedentary work but does not have the residual functional capacity to perform his past relevant work, and (2) that the Commissioner sustained his burden of showing that jobs exist which plaintiff can perform, plaintiff was denied benefits as a result of the ALJ's findings at the fifth step of the sequential analysis.

## V. TREATING PHYSICIAN'S ASSESSMENTS

Plaintiff argues that the ALJ erred by failing to give appropriate weight to the assessments of plaintiff's treating physician, Dr. Michael Ball.

In his opinion, the AU had this to say about Dr. Ball:

The claimant's family doctor is M.D. Ball, D.O. Dr. Ball completed a "Social Security Residual Functional Capacity Assessment Form" at the request of the claimant's attorney on August 31, 1994. This form, composed and provided by the claimant's attorney, specifically directed the physician to base his conclusions and opinions on "all the evidence in [his] records including clinical and laboratory results, symptoms, signs, observations, lay evidence, reports of daily activities, etc." It further cited *Lanning v. Heckler,* 777 F.2d 1316, 1318 (8th Cir.1985) to define residual functional capacity for the physician as "the ability to perform the requisite physical acts day-in

and day-out, in the sometimes competitive and stressful conditions in which real people work in the real world."

The responsibility for assessing the claimant's residual functional capacity rests with the undersigned Administrative Law Judge, not Dr. Ball. 20 CFR 404. 1527(e)(2) and 404.1546. While the form utilized by the claimant's attorney could be viewed as a mislabeled Medical Source Statement (MSS), it clearly exceeds the parameters of acceptable medical opinion evidence as described in 20 CFR 404.1527. The form calls for Dr. Ball to judge the claimant's credibility by directing him to consider "all the evidence in [his] records including clinical and laboratory results, symptoms, signs, observations, lay evidence, reports of daily activities, etc." and asks him to consider the severity of symptoms based on "non-medical evidence, which includes statements by the Claimant and others, and observations regarding activities." Credibility is a legal, not a medical, judgment.

Moreover, even if it were appropriate for Dr. Ball to assess the claimant's residual functional capacity based in part upon his opinion of the claimant's veracity, the record does not establish an adequate basis for such a judgment. The record establishes only that the claimant has been seen by Dr. Ball on several occasions since 1986. If Dr. Ball is to serve as the claimant's character witness, the basis for his personal knowledge of the claimant's veracity should be stated. As question 10 is phrased, it is assumed that if the claimant's complaints *could* be caused by his medical conditions, they must be credible to the degree alleged. ... [2]

In addition to legal judgments, the attorney's form assumes that the physician has specialized knowledge of "competitive and stressful" work conditions and is otherwise familiar with workplace demands. Absent a showing that Dr. Ball is a vocational expert, it is inappropriate to elicit his opinion based even in part on vocational factors.

Although Dr. Ball reported back pain, he offered no supporting diagnoses or tests. The only mention of back pain in his office notes appears in 1987, when the claimant had a urinary tract infection. He has treated the claimant for chest pain, but has consistently reported normal EKGs on those occasions. He accepted the claimant's allegation of paresthesia of both upper and both lower extremities, without testing and without further treatment, even though no complaints regarding paresthesia were recorded before the day the claimant appeared in his office with the form .... Dr. Ball concluded that the claimant had various subjective complaints, but offered no diagnoses or signs of illness or injury. To the contrary, a consultative cardiologist found no ischemia, and there is no evidence of impairment of the lumbar or cervical spines. It is apparent that Dr. Ball's opinion regarding these impairments are unsupported by medical signs and laboratory findings, and that his opinion is contradicted by the opinion of a specialist in cardiology, and by objective tests. Accordingly, his residual functional capacity assessment must be viewed as a statement of the claimant's subjective complaints, and is not entitled to great weight. 20 CFR 404.1527(d)(3) and (5).

Because the residual functional capacity assessment form requires Dr. Ball to make legal judgments, is based on an incorrect legal standard for the credibility assessment portion, requires Dr. Ball to have specialized vocational knowledge, and is inadequately supported by medical findings, the undersigned finds that it is not entitled to controlling weight. Instead, the form must be viewed as what Dr. Ball believes the claimant can do even were all of his subjective complaints true. *See Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir.1993) (the opinion of a treating physician based solely on the claimant's complaints of pain is entitled to little weight).

Plaintiff argues that Social Security Disability Determinations uses "the very same

2. I am unclear exactly what question the ALJ is referring to here since there is no question num- bered "10" on the form completed by Dr. Ball.

basic form" used by Dr. Ball when asking physicians to assess a claimant's physical limitations and restrictions. He points out that Dr. Ball wrote that the reported limitations in upper and lower extremities were the result of "objective findings" and that the finding of reduced range of motion in the lumbar area was the result of his examination of the patient.[3]

## A. FORM USED BY DR. BALL

First, in comparing the forms used by plaintiff's counsel and SSA, it is clear that the paragraph describing the residual functional capacity (and citing *Lanning v. Heckler*) which is included in the form filled out by Dr. Ball does not appear in the form used by SSA (compare Tr. at 154 and 259). In addition, in the general instructions section of plaintiff's form, it states that the doctor's conclusions and opinions should be based on "reports of daily activities" which is not included in the SSA form (Tr. at 260). Therefore, the forms are not identical as claimed by plaintiff.

Second, the purpose of the form used by SSA to make a determination of disability is different from the purpose of the evidence submitted by plaintiff to the ALJ. 20 C.F.R. § 404.1546 states in part as follows:

> The State agency staff medical or psychological consultants or other medical or psychological consultants designated by the Secretary are responsible for ensuring that the State agency makes a decision about your residual functional capacity. In cases where the State agency makes the disability determination, a State agency staff medical or psychological consultant must assess residual functional capacity where it is required.... For cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests

with the Administrative Law Judge or Appeals Council.

Therefore, when the Residual Physical Functional Capacity Assessment form was filled out on September 29, 1993, its purpose was to assist SSA (the agency) in making a determination of plaintiff's residual functional capacity. However, when the ALJ considered the Residual Functional Capacity Assessment Form completed by Dr. Ball, the only portions he was entitled to consider were the medical opinions which were supported by medically acceptable clinical and laboratory diagnostic techniques. *See* 20 C.F.R. § 404.1527(d)(2).

Third, the definition of residual functional capacity which was included on the form filled out by Dr. Ball is the definition which an ALJ must use in determining whether a claimant can perform certain jobs, and this is normally done with the assistance of a vocational expert. The definition itself leads to the conclusion that it is not an assessment that can be made by a doctor: "[t]he [residual functional capacity] that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." The ALJ was correct in noting that any opinion by Dr. Ball using this definition was beyond the ability of a treating physical since it incorporated vocational factors.

For these reasons, I find that the ALJ properly discounted the portions of Dr. Ball's Residual Functional Capacity Assessment Form which take into account vocational factors.

## B. WEIGHT GIVEN TO DR. BALL'S OPINION

Plaintiff claims that the ALJ erred by failing to give the appropriate weight to Dr. Ball's assessment of plaintiff's impairments.

---

**3.** Plaintiff also states that "[t]his form is the standard form claimant's attorney has previously used for all Social Security disability clients. ... This ALJ has never raised this issue in any previous rulings of Social Security Disability cases. If the form is incompatible with Social Security regulations, why has Plaintiff's attorney never been informed of the ALJ's objections on any

previous claims?" If this were a basis for error, every judge who ever took the bench would be required to address every single issue on his or her first case, whether raised by the parties or not, to avoid creating "precedent." Although I understand counsel's frustration, this argument is without merit.

The medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician. *Ward v. Heckler,* 786 F.2d 844, 846 (8th Cir.1986) (per curiam). However, such an opinion is not conclusive in determining disability status since the opinion must be supported by medically acceptable clinical or diagnostic data and the record must be evaluated as a whole. *Cruze v. Chater,* 85 F.3d 1320, 1324 (8th Cir.1996); *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996). A treating physician's opinion will be given controlling weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record". 20 C.F.R. § 404.1527(d)(2).

In this case, the ALJ was correct in finding that Dr. Ball's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques.

Dr. Ball diagnosed plaintiff with the following impairments: Chest pain, chronic lumbar pain, and paresthesia of the upper extremities (Tr. at 259). The form asked Dr. Ball to explain "how and why the evidence supports your conclusions" that plaintiff is limited to lifting and carrying occasionally 10 pounds, lifting and carrying frequently less than 10 pounds, standing and/or walking for a total of at least 2 hours per work day, must continuously change positions due to low back and leg pain with worsening of pain after 15–30 minutes, and is limited in pushing and/or pulling in both upper and lower extremities (Tr. at 260–261). Dr. Ball wrote, "The objective findings are reduced [range of motion] in the lumbar spine, reduced grip strength of upper extremity. With regard to the patient's chest pain, I have no positive laboratory evidence but, from what Mr. Hinkle informs me he has had positive findings by his cardiologist." (Tr. at 261).

There is no mention in any of Dr. Ball's medical notes of tests dealing with plaintiff's lumbar spine or reduced grip strength. In addition, Dr. Ball assumed that plaintiff's reports of his cardiologists' findings were accurate. Merely because Dr. Ball begins his explanation with the phrase "the objective findings are" does not mean that whatever follows is supported by medically acceptable clinical and laboratory diagnostic techniques.

Dr. Ball found that plaintiff can never climb ramps, stairs, ladder, ropes or scaffolds; and can never stoop, kneel, crouch, crawl or bend (Tr. at 261–262). In response to the statement "please describe your answers", Dr. Ball wrote "[t]his patient complains of chronic lumbar pain and exam of 8/30/94 reveals reduced [range of motion] in the lumbar area." (Tr. at 262). Dr. Ball's notes from the August 30, 1994, exam state as follows:

| Physical Exam | | √ = Normal | |
|---|---|---|---|
| HEENT | √ | ABD | √ |
| Lymph | √ | Ext | √ |
| Heart | √ | Skin | √ |
| Lungs | √ | Neuro | √ |
| Lab | N/A | | |

Assessment Paresthesia Upper & Lower Extremities

There is nothing is Dr. Ball's notes of the August 30, 1994, exam which indicate than anything other than plaintiff's complaints led to his diagnosis of paresthesia of the upper and lower extremities. Indeed all of the areas checked during this physical exam were marked "normal" by Dr, Ball. The ALJ noted that the first time plaintiff complained to a doctor about this problem was on the day he appeared in Dr. Ball's office with the form prepared by his attorney for use in this social security disability case (Tr. at 16).

Dr. Ball assessed plaintiff's ability as "limited" in the following categories: reaching all directions (including to the front, to the side, from below and above the head), handling bilaterally, and fingering bilaterally (Tr. at 262). Although the form stated that the assessor was to explain if any of these activities were rated "limited," Dr. Ball did not write anything in this section to explain the basis for these findings (Tr. at 262).

Dr. Ball recommended that plaintiff avoid even moderate exposure to vibration and

heights; and in his explanation, wrote, "vibration I feel would exacerbate symptoms of numbness and tingling this patient experiences." (Tr. at 264). Dr. Ball stated that heights should be avoided due to reduced range of motion in lumbar spine and upper extremities (Tr. at 264). Once again, there was no explanation of how these findings were made other than by basing them on plaintiff's complaints.

There is nothing in the form itself or in Dr. Ball's past medical notes which indicate that tests were performed which support the conclusions made on this form.

In addition to being well-supported by medically acceptable clinical and laboratory diagnostic techniques, in order to be given controlling weight, a treating physician's opinion must not be inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). In this case, Dr. Ball's opinion was contradicted by the findings of Dr. Thomas Cochran, a cardiologist, who found in July 1994 that plaintiff was not disabled (Tr. at 245). During plaintiff's January 25, 1994, visit to Dr. Cochran, plaintiff reported that he does minor calisthenics at home despite his smoking a pack of cigarettes a day (Tr. at 241). In the medical notes of Dr. Cochran after plaintiff's July 28, 1994, appointment, Dr. Cochran noted that plaintiff is apparently active at home, carrying on moderate sedentary activities (Tr. at 244). He also noted that plaintiff's medical condition was unchanged compared to plaintiff's condition in January of 1994 (Tr. at 244). Dr. Cochran found that there was no evidence of an ischemic response and that serial EKGs immediately, 1, 2, 4 and 6 minutes after exercise did not reveal any arrhythmia (Tr. at 247).

Because Dr. Ball's opinion was inconsistent with Dr. Cochran's, it was not entitled to controlling weight by the ALJ. 20 C.F.R. § 404.1527(d)(2).

Generally, more weight is given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. § 404.1527(d)(5). Dr. Cochran is a cardiologist—a specialist in the area of plaintiff's impairment. Dr. Ball is a family doctor.

In addition, the more knowledge a treating source has about the impairment, the more weight that person's medical opinion is given. 20 C.F.R. § 404.1527(d)(2)(ii). The treatment and the kinds and extent of examinations and testing is considered. *Id.* "For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain." *Id.* In this case, Dr. Ball was not the treating physician for much of plaintiff's medical history. Each time plaintiff was treated for chest pains, he had presented himself to an emergency room of a hospital. Dr. Myears treated plaintiff in 1990, successfully reducing a coronary artery narrowing from 99% to 20%. Dr. Myears and Dr. Powell were more involved in treating plaintiff's heart problems than Dr. Ball was.

The ALJ noted in his opinion that since plaintiff's surgery in 1990, there has been no evidence of subsequent worsening of plaintiff's cardiac condition (Tr. at 14). Plaintiff has had no subsequent signs of myocardial ischemia or pulmonary emboli (Tr. at 14). Although Dr. Ball has treated plaintiff (in the form of prescribing medications) for chest pains, he consistently reported normal EKGs on those occasions when plaintiff complained of chest pains (Tr. at 16). The ALJ properly based his opinion on the assessments of the cardiologists who examined and/or treated plaintiff and performed different tests to support their conclusions. Therefore, I find no error in the ALJ's discounting the opinion of Dr. Ball in the form of the Residual Functional Capacity Assessment Form which was presented at the hearing.

## VI. SUBSTANTIAL EVIDENCE

■ Plaintiff argues that the ALJ's decision is not supported by substantial evidence based on the record as a whole. To determine whether the Commissioner's final decision is supported by substantial evidence, the court must review the administrative record as a whole and to consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Cruse v. Bowen,* 867 F.2d 1183, 1184–85 (8th Cir.1989).

Plaintiff's challenge to the sufficiency of the evidence is that the hypothetical questions and the vocational expert responses which the ALJ relied on did not encompass all of plaintiffs impairments. Specifically, plaintiff claims that the limitations of plaintiff's upper extremities—limitations in reaching, handling bilaterally and fingering bilaterally—were not considered in the hypotheticals.

■ Whether the hypothetical questions were posed properly is determined by examining the other factors listed above. *Id.* Hypothetical questions posed to a vocational expert need only include those impairments that the ALJ accepts as true. *Johnson v. Chater,* 108 F.3d 178, 180 (8th Cir.1997); *Long v. Chater,* 108 F.3d 185, 188 (8th Cir. 1997); *House v. Shalala,* 34 F.3d 691, 694 (8th Cir.1994).

Vocational expert Mark Schulzinger was given the following hypotheticals by the ALJ:

I want you to assume that the claimant, Robert Hinkle, is age 31, that he has the age and education as appears in the record or as testified to today [9th grade education]. I want you to assume that he has status post percutaneous heart surgery, that he has limitations as a result—or he has limitations or exertional limitations as found by Dr. Ball that he can lift and/or carry ten pounds occasionally, less than 10 pounds frequently, stand or walk for a total of two hours out of an eight hour work day, sit for six hours out of an eight hour work day, that he is limited in his upper extremities as to the weight prescribed. And that he would be limited in the foot controls, also to the same limitations. Would there be any work that such an individual could perform on a sustained basis?

(Tr. at 78). The answer was yes. Mr. Schulzinger described jobs as a small products assembler II, a patcher, and a food and beverage order clerk (Tr. at 78–79). The ALJ then posed the next hypothetical:

If I add to the hypothetical that the individual has to continuously change positions due to low back pain and leg pain every 15 to 30 minutes, would that change the answer which you gave me?

(Tr. at 79). Mr. Schulzinger stated that the food and beverage order clerk job could be performed by an individual with those limitations (Tr. at 79). The ALJ then added the requirement that the person must avoid even moderate exposure to vibration, but Mr. Schulzinger stated that such a limitation would not effect the person's ability to perform the food and beverage order clerk job (Tr. at 80).

■ Plaintiff takes issue with the vocational expert's testimony when faced with this hypothetical, i.e., that such a person could still do "that one silly job I gave you about the food and beverage order clerk". A food and beverage order clerk was described as an employee who takes food and beverage orders over the telephone but does not serve the food and beverages (Tr. at 82). Plaintiff argues that "[i]t is most unlikely that any fast food place in this area of the state would have a position such as this." The vocational expert presented evidence that there are 16,000 such jobs in the state of Missouri (Tr. at 84). Plaintiff presented no evidence to contradict that presented by the vocational expert and the ALJ found the vocational expert credible.[4] Furthermore, the question of whether jobs exist in significant numbers is ultimately left to the "trial judge's common sense in weighing the statutory language as

---

4. Knowing many people who phone in orders for pizza deliveries, I personally do not find it diffi-

cult to believe that there are numerous such positions in this metropolitan area.

applied to a particular claimant's factual situation." *Long v. Chater*, 108 F.3d 185, 188 (8th Cir.1997); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir.1988). Here the vocational expert testified that plaintiff is capable of performing any of the approximately 16,000 food and beverage order clerk jobs that exist in the state of Missouri. The ALJ found this to be a significant number and I agree. The fact that Mr. Schulzinger characterized the job as "silly" at one point during his testimony does not change the fact that those jobs exist and that plaintiff is capable of performing the duties associated with those jobs.

Plaintiff's counsel posed two additional hypotheticals to the vocational expert. The first added to the ALJ's final hypothetical the condition that the employee must lie down and rest for as much as three hours during a work day (Tr. at 85). The vocational expert testified that such an individual would not be capable of performing any work (Tr. at 85). Plaintiff's counsel then added to the judge's hypothetical the condition that the employee is limited in reaching in all directions, including to the front, to the side, both below and above the head, and that he is limited in handling bilaterally and fingering bilaterally (Tr. at 86). The vocational expert testified that such an individual could perform the duties of a food and beverage order clerk (Tr. at 88).[5]

The only hypothetical which resulted in testimony by the vocational expert that such an individual would be incapable of performing any job included the condition that the person is required to lie down and rest up to three hours out of an eight-hour work day. However, the ALJ did not accept this condition as true.

 There was no medical evidence to support plaintiff's claim that he is required to lie down and rest for lengthy periods during the day. In fact, all of the medical evidence

stated that plaintiff's chest pains were not necessarily related to exercise and sometimes occurred while he was resting (Tr. at 204, 210, 228, 240). It is certainly possible that plaintiff's "need" to lie down and rest during the day is related to his heavy smoking rather than to his chest pains. When an impairment can be controlled by treatment or medication, it cannot be considered disabling. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir.1995); *Stout v. Shalala*, 988 F.2d 853, 854 (8th Cir.1993); *Warford v. Bowen*, 875 F.2d 671, 673 (8th Cir.1989). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. *Roth v. Shalala*, 45 F.3d at 282. Plaintiff was advised on numerous occasions by his doctors to quit smoking, yet as of the day of the hearing he continued to smoke at least a pack of cigarettes per day. Therefore, even if the ALJ had found credible plaintiff's testimony that he is required to lie down for up to three hours during the day, it would not be a basis for finding plaintiff disabled since the medical evidence shows that the need to rest is not caused by chest pains but is likely caused by plaintiff's extremely long history of smoking cigarettes.[6]

Because the hypothetical questions posed to the vocational expert included only those impairments which the ALJ accepted as true, and because there was no medical evidence to corroborate plaintiff's subjective complaint that he is required to lie down and rest for up to three hours during the day, the ALJ did not err in finding plaintiff's testimony not credible and did not err in excluding that condition from the hypothetical questions posed to the vocational expert.

## VII. CONCLUSION

For the reasons stated above, I find that (1) the ALJ properly discounted the opinion

---

5. His exact testimony was as follows:

A. All right, if you want me to add changing position[s] every 15 to 30 minutes and avoid vibration, there are no jobs such a hypothetical individual can perform, there being no jobs in the national or regional economy—wait, you've got me all confused, thank you very much, except that one silly job I gave you about the food and beverage order clerk.... (Tr. at 88).

6. It may also be caused by plaintiff's gradual increase in weight. According to the evidence, plaintiff weight 162.5 pounds on August 24, 1993; 184 pounds on January 25, 1994; 193 pounds on July 28, 1994; and 200 pounds on October 21, 1994 (Tr. at 35).

of Dr. Ball, and (2) the ALJ properly excluded from the hypothetical question posed to the vocational expert the condition that plaintiff must lie down and rest for up to three hours a day.

Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that defendant's motion for summary judgment is granted.